I should say, these cases under advisement. All right, our second case for this morning is James against Eli and Willa Neustra. So, Mr. Stander. Good morning, your honors. Robert Stander here for the appellate. For two reasons, the district court abused its discretion by denying Thomas James's motions to recruit counsel. First, it failed to address the relevant arguments and factors. And second, even if it had, it was unreasonable to deny counsel in these circumstances. I'd like to focus this morning on the first of those problems, the failure to address the relevant arguments. There are three orders at issue in this case. In the first, the district court applied an incorrect standard by asking whether a lawyer would assist the court or affect the outcome. Pruitt makes clear that those questions are reserved for this court on appellate review. And that when a district court applies those, that is part of the standard, it's reversible error. In Mr. James's second motion, he explained to the district court that he'd been transferred to a prison in Arizona, that he needed a medical expert, that he was unable to conduct necessary discovery, and that he suffered from daily migraine headaches that prevented him from litigating his case. So, Mr. Stander, just so I'm keeping the timeline clear, you're talking about the February 6, 2014 order, the second denial? That's correct, Your Honor. And as of that time, one of the things you mentioned in your brief is that Mr. James was trying to obtain discovery, but was doing it the wrong way, was filing motions. Had that happened yet at this point, or was that still to come? Some of it had certainly happened, and some of it was still to come. What had already happened is he had filed certain motions for asking the district court to issue orders regarding discovery. In any event, the district court didn't address any of those factors at all. So regardless of what had happened or what had not happened, it didn't explain its reasoning. It didn't discuss the transfer to Arizona. Right, but I guess the reason I'm looking at this is because one of the arguments I understood you'd be making to show why the relatively boilerplate kinds of statements the district court made in each of those three denial motions were wrong is because the record itself shows that Mr. James is floundering around, not going about discovery the right way, not getting the full benefit that discovery with counsel might have given him. That's correct. Again, there are three motions at issue. Between the second and third motion, by the time the district court denied the third motion, all of the things that we're relying on had either happened or were in the process of happening. Between the two motions, the district court was certainly aware of Mr. James' inability to conduct relevant discovery. And again, in the February 6th order, it didn't address the relevant factors here, which are the transfer to Arizona. It didn't say anything about the need for a medical expert. So regardless of any discovery issues, the district didn't say anything about his request for a medical expert. Right, so unexplained. And by the February 6th order, am I correct that the district court was satisfied that Mr. James had looked hard enough himself for counsel? That's correct, Your Honor. Maybe not in the first order, but by the second order, that was off the table. So we're really just focusing on the other part of the Pruitt test. That's correct. Even in the first order, the district court said that Mr. James had satisfied that requirement. And in the second order, Mr. James submitted letters from law firms demonstrating that he satisfied that requirement. So we're only dealing with the abuse of discretion issue. Hypothetically, if the district court had said, well, I'll try to find counsel for you and can't, then where are you then? That is the requirement for a district court to attempt to recruit counsel. I understand that. But my hypothetical is he can't find him. He makes a tremendous effort to find counsel and can't find him. Then the burden of lacking counsel at that point would be on the plaintiff, and that would end the issue. Here that didn't happen. The district court didn't. Well, I understand that, but that's the theoretical thing is having been in situations like that as a trial judge, and particularly not urban areas like Chicago or New York or D.C., it's sometimes difficult to find counsel to do that. That may be true. Not sometimes. It is often difficult. That may be true, Your Honor. And if you cannot find them, where do you go there? Again, the burden would then be on the plaintiff. The lack of counsel would then be on the plaintiff. And we'd be where we are now. Well, there would be no appeal from that because the district court would not have abused its discretion if it had actually tried to recruit counsel. So that would be off the table. The bottom line here is the district court. So it's the chance for counsel that somebody is actually pursuing. It's not like Gideon. It's not that there's a guarantee of success. But there's at least a chance for counsel if the judge does what Pruitt indicates. That's correct, Your Honor. And a slew of this Court's cases make clear that the district court must address the relevant factors. And this is southern Indiana. Don't they have a court rule requiring a certain amount of pro bono time for members of the bar? I do not know that that's the case in the southern district of Indiana. I think it's a new one. So because under DeWitt v. Korizon, it is indisputably an abuse of discretion for the district court to fail to address the factors the way it did in the second motion and the third motion. So the only real issue here is prejudice. And Mr. James suffered prejudice for two reasons. First, without a lawyer, he couldn't investigate key facts and witnesses. And second, without a medical expert, he could not get to square one, which is his failure to treat claims. So on the first issue, the discovery issue, here's what a lawyer would have done. For the foot injury, a lawyer would have obtained records and testimony from the foot doctor, the doctor who actually performed the procedure. As of now, Mr. James does not know the name of that doctor. He's done no investigation with respect to that doctor whatsoever. A lawyer would also have deposed Dr. Eli. And as for the jaw injury, a lawyer would have obtained records and testimony from Dr. Cohen. Dr. Cohen is the other doctor at Wishart Hospital who examined the jaw. A lawyer would have obtained records from Dr. Quintia, who treated Mr. James about a year after the injury here. And a lawyer would have deposed Dr. Villanustre. As to both injuries, a lawyer would have investigated whether the prison had any records related to James's care or related to the denial, reasons for denying medical care to prisoners in general. Mr. James did none of those things because he did not know how and because he was in a prison in Arizona while the litigation was in Indiana. As to the medical expert issue, James needed an expert to do three specific things. Examine the records, establish the standard of care, and testify. There are some disputed issues about that, right? Because I gather the jaw injury severed the link between the jaw and the skull. And so he alleges, I think, that he's left with the inability to chew properly the permanent impairment. Correct. Which may or may not be true, obviously, from the records. We don't know. That's correct. And the severity of the injury and the way that it failed to heal shows why there's prejudice here. Do we know the date of this injury, by the way? It looks like it could have been as early as the end of November or as late as mid-December. Yes, so we don't know the exact date of the injury. Mr. James's toenail was surgically removed on November 20th, and then he filed his first form for emergency relief for his jaw on November 27th. It was between those two dates is when it occurred. So late November. Right. And there's some indication, although it's not clear, that he says something to Dr. Eli prior to the late December encounter? That's correct, although for purposes of today, the court can assume that the defendants are correct that Dr. Eli did not know until December 27th, because even then there was still a six-day delay in providing emergency medical treatment for a broken jaw and a displaced condyle. The injury, Mr. James asserts that his face was severely swollen, that he was unable to eat properly, and yet rather than providing emergency medical treatment, there was a six-day delay. And a medical expert could possibly testify that that six-day delay in emergency care was a substantial departure from the standard of care. So backing up one step. As to the foot injury, the lack of standard departure, that doesn't fit. That sounds more like malpractice rather than deliberate indifference. So this court has made very clear in cases like Petty's v. Carter, its en banc opinion from 2016, that provision of some medical treatment does not automatically defeat a deliberate indifference claim. When some treatment is provided, the question becomes whether there was a substantial departure, such a substantial departure from the standard of care. Such an extreme departure that you move over into the territory of deliberate indifference. That's right. Which is, of course, just malpractice, mere malpractice as we like to say is not enough. That's right. But again, so Petty's v. Carter and at least four cases. You know, it's not quite as clear as you indicate. This court is not solidly taking that approach. So Petty's v. Carter is an en banc opinion from 2016, and it says that one way to show deliberate indifference is when the treatment provided was such a substantial departure from standard of care that the decision was made, the jury could infer that the decision was based on something other than medical judgment. And that's all we're saying here. In fact, we're not even saying that that's actually the case here. All we're saying, so to show prejudice, Mr. James does not have to show that he is entitled to summary judgment on this record. He doesn't even have to show that he would have won with a lawyer. No, I think I understand your argument to be that the record that got created for the summary judgment process was so deeply flawed because of the lack of a lawyer under these particular facts that that's why it was an abuse of discretion, or at least not to explain why the lawyer was not being given, an abuse of discretion probably not to appoint the lawyer. Had the record been proper, maybe all it would have shown is a failure to reach standard of care. He loses. Maybe a good record would have shown that he was the victim of deliberate indifference. Then he moves forward, or at least that a jury could so find. Not a finding of that, but that a jury could so infer. So it's just like actually an evidentiary objections where the problem is the nature of the record. And we're not yet at the merits point here. So I agree with all of that, Your Honor. I would just add the additional points that not only was the record undeveloped, but Mr. James told the district court that he was transferred to Arizona and from that location couldn't do the required discovery. He also told the district court that he needed a medical expert and that this was the kind of claim that needed that, and the district court didn't analyze that. That's indisputably an abuse of discretion under DeWitt v. Correia. So if the district court had written an opinion saying, Mr. James says he needs a medical expert, but I've decided that no medical expert is needed in this case for the following reasons, A, B, C, D, E, that would be enough? So it's possible that that would be enough. At least it would be a closer case. It still is possible that it would be unreasonable. That reasoning would be unreasonable, but at least it would be closer. Here he didn't even do that. So all that's necessary to reverse is to say address the relevant factors. That doesn't expand the scope of any so-called right to counsel. All it does is say in the future district courts, go ahead and address the factors. And if there are no further questions, I'd like to reserve. Thank you. No problem. Mr. Crandall. Good morning, Your Honors, and may it please the court. Judge Lawrence was reasonable by considering each of Mr. James' requests for counsel, applying the appropriate legal standard, and using his discretion to deny each, as Mr. James had shown he was competent to litigate his own case based on the He just has the same boilerplate in all three motions. And I have trouble understanding how he came to that conclusion. Maybe he could have come to it, but the boilerplate doesn't tell me why Mr. James, who is failing to use the discovery rules appropriately, who is not able to get a medical expert, they're not always necessary. I've seen cases where doctors have just walked by while somebody is convulsing on the floor. You don't need a medical expert to tell you that that's a problem. Other cases, it's a more subtle question, and you do need a medical expert. So I don't see why, at a minimum, a better explanation wasn't called for, and at a maximum, why it wasn't an abuse of discretion to at least try, under Southern Indiana Local Rule 87, to recruit counsel. Your Honor, I would agree that Judge Lawrence could have added more in-depth analysis. And I'm saying should have added more, because I don't understand why this man, who is making mistakes right and left, and who has, it appears, a permanent impairment in eating and disfigurement, why he doesn't at least have a chance to present a full package of facts for summary judgment purposes. To answer both of those, Your Honor, Judge Lawrence witnessed Mr. James's multiple filings throughout this case. He was in the best position to determine... And Judge Lawrence keeps saying, this is a bad filing. You've made a mistake here, you've made a mistake there. So why he says this is so effective when he keeps making mistakes, I don't understand. It's no doubt Mr. James made several mistakes, but Mr. James also litigated his case appropriately several times. Early on in this case, Mr. James successfully defeated a motion dismissed that was filed by the co-defendant. He did that on his own very early on in this case. And that's fine, but I just... When we're getting to a later stage where you've got to have the evidence collected, it seems that the inability to collect that evidence, filing the wrong kind of motion, not asking the right thing, no ability to follow up when the defendants aren't giving the records, no ability to depose people because you're off in Arizona, I don't see why that's so great, why that's a fair process. Mr. James did obtain discovery. He obtained every record that was in Dr. Eli's possession. That's what Dr. Eli said, but he doesn't have a chance to depose Dr. Eli. He doesn't have a chance to nail down exactly when he found out about certain things. There are a lot of important things he isn't able to follow up on, and I'm not comfortable with the rule that says, you know, the defendant gets to decide exactly what the defendant is going to produce. That's not the system. You're right, Your Honor, and it was discovery, and we produced every record in our possession that was from the prison, and that was also from Dr. Ronald Quinta, the oral surgeon Mr. James saw in Arizona. So Mr. James was playing from the same set of records that was Dr. Eli. I don't even know that that's clear, and your opponents are saying that, again, the ability to follow up on critical dates that would help us answer that important question. Judge Kaney is asking, like, does this package of facts, could a rational trier of fact from this package of facts, from the proper package of facts, I would say, not this one, infer deliberate indifference, or would a rational trier of fact see at the most malpractice? And he doesn't have any chance for follow-up. I disagree, Your Honor. Mr. James had the ability to serve depositions by written question through the mail to Dr. Eli or to Dr. Villanustre. He did not do so. But he didn't know he could. I don't know if we know that or not from the record, Your Honor. He knew how to file motions for extensions of time, how to serve discovery. He did many things. And whether he knew that specific instance, I don't know. But in my 12 years, I have never seen a pro se inmate take a deposition. But I believe, Your Honor, whether it was an abuse of discretion by Judge Lawrence, what we have to turn to here is did that prejudice Mr. James, meaning was there a reasonable likelihood that giving him an attorney would have changed the outcome? And there was not. Change the outcome just means a different package of facts. So he does, he wastes time with, you know, motions for transfers of venue. He doesn't focus on things. He's filing these notices. He's told that, you know, you can't serve a subpoena. He's asking for temporary restraining order. He's done all sorts of beginner's mistakes, so to speak. Well, the medical records lay out what the factual chronology of this case was, and Mr. James had those medical records. But does it show that Mr. James said that on November 27th he first complains about the jaw. So the jaw is there for a month before he runs into Dr. Eli. Actually, I believe I don't have my site here, but actually Mr. James says December 27th, 2007. No, I think there's some dispute in the record about that because he, and I think he has verified complaints. And he says, I need to find this somewhere, but I believe he says that as early as November 27th he's complaining about the jaw. That's what your opponent just said. I think it was a month after he removed the toenail. Your opponent just said it was November 27th. I believe that's inaccurate, Your Honor. If you look at the supplemental appendix of page, I believe it's 365, Mr. James concedes himself that he spoke to Dr. Eli about his jaw on December 27th. That's speaking to Dr. Eli. I'm talking about when the break happened. And he says, there's one reference in the record to a mid-December comment, and then he runs into Dr. Eli because there's a statement that two and a half weeks ago I said something to you. Your Honor, you're referring to a health care request that Mr. James submitted with Dr. Eli's assistance on December 27th, 2007. And as I read that. Which has the allusion to the earlier request. Your Honor, how I would interpret that and how I read that, and there's been no dispute from appellant's counsel that, is that whether Mr. James made requests prior to this, Dr. Eli wouldn't have been aware of those. And that this was the first date on which Dr. Eli became aware that Mr. James had a problem with his jaw. Mr. James, in his own writing, says, I hurt my jaw again two days ago eating dinner. It wouldn't be expected for Dr. Eli to think that was an emergent condition to injure someone's jaw so significantly just eating dinner. I mean, I imagine the prison food's not great, but it can't be that bad. Well, he says he fell on the stairs. There are different estimates about when this fall happens. But in this December 27th thing, he says, I explained to Dr. Eli two and a half weeks ago I slipped and hit my chin on the step rail. And he'd already submitted two medical request forms by that date. And he also states, Your Honor, that this happened quickly and the swelling went down. I think it's still disputed whether, I don't believe he actually told Dr. Eli two and a half weeks ago. I think he's relaying the story to Dr. Eli. And isn't this the kind of thing that a lawyer could get to the bottom of? You might just get rid of this case in a minute with a decent lawyer, or you might realize that there's something to go on. Now, Mr. James had the ability, in which he did, to file a declaration, a designation, his own affidavits. He could have said, I talked to Dr. Eli two and a half weeks before this happened. This was the second time I told him. He didn't say that. So you're assuming expertise that Mr. James clearly doesn't have. I disagree, Your Honor. I think Mr. James was competent enough to lay out the facts of his case, which Judge Lawrence, in his entry, said he understood the facts of his case. He knew his two issues he was pleading every time. He's the most familiar to know his facts as he lived it. Wow. Now, appellant cites several cases for his position that Judge Lawrence abused his discretion in denying Mr. James' motion to appoint counsel. And he never does discuss the factors that your opponent notes, the fact that he's in Arizona, the fact that he has the migraines, the fact that he's disabled some of the time, the fact that he doesn't know anything about depositions on written questions or the like. That's correct, Your Honor. Judge Lawrence does not specifically address those. He doesn't say a word about it. No, he does not. That's correct. Whether Mr. James is incarcerated in Arizona or Indiana or anywhere else, his means by which to communicate with the court, communicate with counsel, serve discovery is exactly the same. It's the U.S. mail. That doesn't change no matter where he's incarcerated. As far as his headaches, it certainly didn't prevent him from filing multiple pleadings, motions for extensions of time, responses to summary judgment, serving discovery. Whether or not it was done exactly as well as an attorney would have done, of course not. But we still have to come back to whether that attorney would have created some new set of facts that would have changed the outcome here, and he would not have. Well, you say that because you don't know what the facts are. Your opponents have suggested quite a few things that a lawyer could have explored. Of course, they're not explored, and if the only record is the one that was made with the cooperation of the defendants, perhaps this would have been the way any district judge would find it. But I think we have a counterfactual problem here. I disagree, Your Honor. I don't believe that there are other facts that are going to be discovered that are different than what is clearly laid out in the medical records as to when Mr. James was seen, what was done. So if you had been representing Mr. James, you wouldn't have wanted to depose Dr. Eli and depose Dr. Villanustra and examine, is it, Kentiana, the doctor in Arizona? You wouldn't have done anything? If I had deposed them, I don't believe it would have changed the facts of this case. I don't believe it would have reached a conclusion that the defendants were anywhere near deliberately indifferent to Mr. James' needs. Well, that's what you think, but if you had been representing Mr. James, you would not have wanted to develop that evidence? I'm surprised. I may have, Your Honor. I do not believe based on the record it would have changed anything. So that evidence is apparently irrelevant because prisoners are never going to be able to develop that on their own. No, I disagree with that, Your Honor. Prisoners have many times in my experience defeated summary judgment motions on their own without counsel based on those records. This set of facts, this course of treatment just does not lend itself anywhere near a finding of deliberate indifference. Judge, you mentioned earlier about whether we're getting into malpractice and whether an expert would be necessary to opine on the course of treatment provided. That's a malpractice issue really there. Well, it's only malpractice in the sense of would anyone exercising medical judgment have done this? If the answer is yes, then you're in the world of malpractice. You are not in the world of 1983. If the answer is, are you kidding? Somebody falls on the stairs and their jaw is dislocated and you don't even do an x-ray, how can you not be exercising medical judgment that way? Somebody's jaw, their teeth aren't lining up anymore because there's no hinge? Your Honor, there's no evidence in the record that Dr. Eli was aware of that incident, again, until Mr. James brought it to his attention. Yeah, right, I'm assuming December 27th. I agree with you. And when that happened, Dr. Eli helped Mr. James get evaluation within 48 hours by another physician who took x-rays. When Dr. Eli saw Mr. James next, those x-rays came back, determined he had a fracture. Dr. Eli sent Mr. James to the ER that very same day. Then Dr. Eli followed the recommendations of the Wishard Hospital specialist. He sent him back to plastic surgery on January 7th to see Dr. Villanustre. Dr. Eli followed the recommendations of the specialist. That specialist determined that surgery was not indicated based on the good function of Mr. James' jaw. And then after that, Dr. Eli followed the recommendations. But that's a disputed issue of fact. Mr. James says that he has permanent impairment of the jaw. So good function of the jaw, permanent impairment of the jaw. Which is it? Dr. Eli is entitled to rely on the specialist's recommendation and interpretation. Is it good function or is it permanent impairment? Based on Dr. Villanustre's assessment at that time, it had good impairment. That's correct. And Dr. Eli... But not deliberate indifference. I'm sorry, Your Honor. Well, on this record, you know, as you portray it, not deliberate indifference. But the question is what difference would a lawyer have made? That's the issue. It's not this record. A lawyer, whether they would have deposed Dr. Villanustre or not or obtained a medical expert, I believe merely could have gotten... So suppose a medical expert would have said that on December 27th, the first thing anybody, anyone would have done is send him off to the emergency room. Just suppose some doctor said that. I believe, then, Your Honor, you have merely a difference of opinion, which, again, does not rise to the level of an Eighth Amendment violation. Ten doctors say that. Everybody says, you know, there's just no way anyone exercising medical judgment would have done what Dr. Eli did. Then, Your Honor, at what point do we stop? How many experts does plaintiff get until we find one that disagrees? I'm just saying, you know, it's very... Under your view, one doctor's word is enough. Not necessarily, Your Honor. Always. Not necessarily, no. Well, then why is this case different? This case is different because these medical issues are not so complex that we need a medical expert. Do you understand the orthopedics of the jaw and so on? I wouldn't say that's common knowledge. From my client's perspective as a general practitioner, it's not complex to understand that when you get a patient who has now been diagnosed with a fracture, you send them to a specialist. That's what Dr. Eli did. You follow the recommendations of that specialist, which Dr. Eli did. We don't need an expert to tell us that's the appropriate standard or within the standard to follow that, and that's certainly not so blatantly inappropriate as to rise to the level of deliberate indifference. In conclusion, Your Honors, Congress did not provide lawyers for all indigent prisoners. Instead, they gave district courts the discretion whether to recruit their services, and we would ask that this court affirm Judge Lawrence's discretion in denying Mr. James' appointment to counsel. Thank you. Thank you. Mr. Stander, anything further? I just have two points in rebuttal. First, I just want to acknowledge the troubles that district courts may have in finding counsel, but the answer to this is to exercise discretion by actually addressing the relevant arguments and addressing the relevant factors. If the district court had done that, it may be a different case. And second, here's the reason why we may suspect that this case rises to the level of deliberate indifference, the seriousness of the injury, the treatment that James received, and the outcome. For the foot injury, he went to Dr. Eli with a severely ingrown toenail, a bleeding toe, and the injury was so severe that the toenail needed to be surgically removed. Instead, he received antibiotics, not for two weeks but for four weeks, until finally another doctor came in and performed the necessary procedure. An expert could potentially opine that that treatment was a substantial departure from the standard of care. For the jaw, Mr. James went to Dr. Eli with a broken jaw, displaced condyle. It doesn't seem to me if the doctor is seeing him over a period of time and does not do it in a way that perhaps was the best medical practice, but that's not anything but malpractice. It may have been within the standard of care. It may also have been negligent. It may also have been so far outside the standard of care that it was based on something other than medical judgment, maybe save costs, maybe some other reason. We just don't want to deal with this many prisoners, make them wait. When Mr. James went to Dr. Eli for the jaw, he had a swollen jaw, he couldn't eat. Instead of providing emergency care, Dr. Eli waited six days. Yes, he followed the recommendations of Dr. Villanustre afterwards, but he still waited for six days before sending him to the emergency room. That six-day delay, an expert could potentially opine, was a substantial departure, so substantial as to rise to the level of deliberate indifference. As to Dr. Villanustre, something went seriously wrong with Mr. James's jaw after he was denied surgery. He suffers from temporomandibular joint syndrome, he suffers from debilitating migraine headaches, and he'll have permanent, lifelong problems with eating. An expert could potentially opine that the failure to provide surgery was so far outside the standard of care that it amounted to deliberate indifference. If there are no further questions, I'll just ask the Court to reverse. Thank you very much, and we appreciate your accepting this case and assisting the Court and your client. Thank you. The case will be taken under advisement.